ATLANTA GAS LIGHT COMPANY,
Petitioner,

v.

U. S. DEPARTMENT OF ENERGY, James B. Edwards, Secretary of Energy, Economic Regulatory Administration, Hazel Rollins, Administrator, Respondent.

ENTEX, INC., Petitioner,

v.

U. S. DEPARTMENT OF ENERGY, ECONOMIC REGULATORY ADMINISTRATION, Respondent.

LACLEDE GAS COMPANY, Petitioner,

v.

U. S. DEPARTMENT OF ENERGY, James B. Edwards, Secretary of Energy, Economic Regulatory Administration, Hazel Rollins, Administrator, Respondent.

AMERICAN GAS ASSOCIATION,
Petitioner,

v.

U. S. DEPARTMENT OF ENERGY, James B. Edwards, Secretary of Energy, Economic Regulatory Administration, Hazel Rollins, Administrator, Respondent.

Nos. 79–2568, 79–3237, 80–1573, 80–7491 and 80–7528.

United States Court of Appeals, Eleventh Circuit.

Feb. 1, 1982.

Bryan, Cave, McPheeters & McRoberts, James J. Murphy, Washington, D. C., for Laclede Gas Assn.

John L. Gurney, Paul C. Wallach, Marya Rowan, Lynn R. Coleman, Russell L. Weaver, Thomas H. Kemp, Anne S. Almy, Peter M. Shane, Dept. of Energy, Margaret A. Weeks, Kathryn A. Oberly, Bingham Kennedy, Dept. of Justice, Washington, D. C., for respondent.

Before TUTTLE, HATCHETT and ANDERSON, Circuit Judges:

TUTTLE, Circuit Judge:

This case arises out of a pre-enforcement challenge to the constitutionality of several provisions of the Power Plant and Industrial Fuel Use Act of 1978 (Fuel Use Act or Act), 42 U.S.C.A. § 8301, *et seq.* (1981), *as amended by* Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 617 (1981). Additionally the petitioners attack the constitutionality of the regulations promulgated by the Secretary of Energy pursuant to the Fuel Use Act. In this appeal we consider whether the statute and its accompanying regulations violate the Due Process Clause of the Fifth Amendment, and whether Congress, in passing the Act, exceeded the limits of its constitutional authority as embodied in both the Commerce Clause and the Tenth Amendment. We conclude that in a pre-enforcement context such as the one presented here, the Act and its regulations cannot be held to be unconstitutional.

Morgan, Lewis & Brockius, John E. Holtzinger, Jr., Karol Lyn Newman, Irvin N. Shapell, Washington, D. C., for Atlanta Gas Light Co.

Patrick J. Keeley, Michael J. Manning, John M. Simpson, Fulbright & Jaworski, Washington, D. C., for Entex, Inc.

John A. Myler, Asst. Gen. Counsel, Arlington, Va., for American Gas Assn.

## I.

### A.

On November 9, 1978, the President signed into law five bills in a comprehensive attempt to improve our nation's energy sit-

uation. The Fuel Use Act, the subject of controversy in the present case, is one of the acts in this legislative package.[1]

The purposes of the Fuel Use Act are, *inter alia,* to conserve natural gas for industrial uses for which there are no alternative fuels; to insure that adequate supplies of natural gas are available for certain essential agricultural uses; and, to reduce the vulnerability of the United States to energy supply interruptions. 42 U.S.C.A. § 8301(b) (1981). The predominant means of effectuating these goals are the Act's prohibitions on the use of natural gas or petroleum as a primary energy source in any new electric powerplant or major fuel burning installations, and the Act's requirement that existing powerplants convert to coal or other alternative fuels by January 1, 1990. 42 U.S.C.A. §§ 8311, 8341 (1981). In addition, the Act restricts the use of natural gas in outdoor lighting. 42 U.S.C.A. § 8372 (1981). This latter provision regulating outdoor lighting is the focus of the present appeal.

Section 402 of the Act instructs the Secretary of the Department of Energy to issue a rule prohibiting local gas distribution companies both from providing natural gas for use in outdoor lighting, 42 U.S.C.A. § 8372(b)(1), and from installing any outdoor lighting fixtures using natural gas. 42 U.S.C.A. § 8372(a).[2] Violators of Section 402(b)(1) are subject to a fine not to exceed $500 for each outdoor lighting fixture involved. 42 U.S.C.A. § 8433 (1981).

The Secretary of Energy is charged with primary responsibility for administering and enforcing the Act, and is authorized to promulgate regulations to that end. 42 U.S.C.A. §§ 8372(d), 8431 (1981). In addition, the Secretary may delegate to the appropriate regulatory authority of the states all authorities and responsibilities regarding outdoor lighting under Section 402.[3] Persons aggrieved by any final rule or order promulgated by the Secretary under the Act are granted a statutory right to file a petition for review in the United States Court of Appeals for the circuit wherein the person resides or has his or her principal place of business. 42 U.S.C.A. § 8412(c) (1981).[4]

---

1. The other four acts are the National Energy Conservation Policy Act, 42 U.S.C.A. §§ 8201–8286b (1981); the Energy Tax Act, 92 Stat. 3174 (codified in scattered sections of Title 26 of the U.S.Code); the Natural Gas Policy Act, 15 U.S.C.A. §§ 3301–3432 (1981); and the Public Utility Regulatory Policies Act, 16 U.S.C.A. §§ 2601–2645 (1981).

2. More precisely, the prohibitions in § 402 detail several schedules of effective dates depending on: (1) whether the customer is an industrial or residential user; (2) whether the gas company was distributing to a particular customer for gaslighting purposes on November 9, 1978; and, (3) whether the gas is being used in a municipal outdoor lighting fixture. *See* 42 U.S.C.A. § 8372 (1981). These scheduling differences are not relevant to the issues before the Court in this case.

 Additionally, the 1981 amendments to the Act substantially alter the extent and timing of prohibition with respect to gas that is distributed to residential customers.

 To avoid confusion, in this opinion discussions of the provisions of the Fuel Use Act will employ section numbers from the public law, whereas citations to the Act will refer to section numbers in the official codification.

3. The delegation provision reads:
 "(e) Authority may be delegated to the States.—
 (1) Under regulations prescribed by the Secretary, the responsibility and authority of the Secretary with regard to outdoor lighting under this section may be delegated to the appropriate regulatory authority of a State if he determines that such delegation would be consistent with the purposes of this section."
 42 U.S.C.A. § 8372(e)(1) (1981). Section 402(e)(2) empowers the Secretary to rescind this delegation "at any time by notifying the State authority of such rescission." 42 U.S.C.A. § 8372(e)(2) (1981).

4. The statute additionally provides that whenever such a petition is filed, the court's jurisdiction to review is prescribed by the requirements set out in the Administrative Procedure Act. 42 U.S.C.A. § 8412(c)(2) (1981). *See* 5 U.S.C.A. § 702 (1977). These requirements include all general standing limitations to federal court jurisdiction. *See, e.g., United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

The regulations dealing with outdoor gas-lighting were published on May 10, 1979, *see* 44 Fed.Reg. 27606 (1979), and amended on May 23, 1980. 45 Fed.Reg. 35206 (1980), later codified at 10 CFR §§ 516.10–.47 (1981). In these regulations, the Secretary issued a rule prohibiting installation of gas-lights and distribution of gas for use in such lights in accordance with the explicit mandate of Section 402. In addition, the Secretary delegated his authorities and responsibilities to the appropriate state regulatory authority as permitted by the Act. Finally, the Secretary promulgated regulations authorizing the Department of Energy to rescind this delegation if it is found that a state has failed to comply with the Act or the regulations. *See* 10 CFR 516.30–.32 (1981).

In August of 1981 Congress passed the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 617 (1981). Section 1024 of this Act amends the Fuel Use Act by eliminating the prohibition on distribution of natural gas to residential users for outdoor lighting purposes in fixtures that were in use before November 9, 1978. These amendments also require local gas distribution companies to inform their customers about the amount and cost of natural gas used in outdoor lighting, and to report to the Secretary on their methods of dispersing such information.[5] Implementing regulations for these amendments have not yet been published.

### B.

On July 2, 1979, Atlanta Gas Company (Atlanta Gas) petitioned this Court for review of the Fuel Use Act regulations published in May, 1979. Petitioners Laclede Gas Company (Laclede) and the American Gas Association (A.G.A.) filed briefs amicus curiae. On January 24, 1980, this Court stayed further proceedings at the request of the government pending further rulemaking by the Secretary. After the Secretary published the amended regulations in May of 1980, Atlanta Gas filed and was granted a motion to amend its original petition to incorporate the amendments to the regulations. At that time this Court also consolidated various petitions for review filed in other circuit courts of appeals by Laclede, A.G.A., and Entex, Inc.[6] Because the petitioners have appealed directly to this Court from the rules issued by the Secretary of Energy, there is no record of findings or conclusions of law established by a lower tribunal.

### II.

Petitioners initially raise a facial attack on Section 402 of the statute and the accompanying regulations, on the ground that the prohibitions contained therein exceed the scope of congressional power under the Commerce Clause of the Federal Constitution.[7] They make three objections to the constitutionality of the Act under the Commerce Clause. First, petitioners note that

5. For reasons that will become clear later in this opinion, these amendments do not affect the outcome of this case. Petitioners' claims that the amendments present additional vagueness problems is not persuasive in light of our holding that a due process challenge to the Act is not ripe at this time. See p. 1369 *infra*.

6. Laclede Gas Company's petition for review, filed in the United States Court of Appeals for the Eighth Circuit, was transferred to this Court, docketed as No. 80–7491, and consolidated with this proceeding by order of the Court issued on July 9, 1980. Entex, Inc.'s petition for review was filed with this Court, docketed as No. 80–1573, and consolidated with this proceeding on June 24, 1980. The American Gas Association's petition for review, filed in the United States Court of Appeals for the Fourth Circuit, was transferred to this Court, docketed as No. 80–7528 and consolidated with this proceeding on July 17, 1980.

7. The Commerce Clause empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S.Const. Art. 1, § 8, cl. 3.

We would admit at the outset some hesitancy in even entertaining jurisdiction to hear the merits of the Commerce Clause challenge. As previously noted, the suit is a pre-enforcement challenge. The petitioners in this case have not been prosecuted for violating any of the statutory provisions or regulations. Indeed no person has been so prosecuted, as the Act has yet to be enforced. Moreover, it is unclear at

regulation of the distribution of natural gas has been a subject of purely local concern historically left within the purview of state or municipal regulatory authority. In support, they rely on several relatively old cases in which the United States Supreme Court declared that in the area of natural gas distribution, interstate commerce ends when the gas passes into the local mains of private distribution companies. *See, e.g., East Ohio Gas Co. v. Tax Comm'n*, 283 U.S. 465, 470–72, 51 S.Ct. 499, 500–01, 75 L.Ed. 1171 (1931); *Public Utilities Comm'n v. Landon*, 249 U.S. 236, 245, 39 S.Ct. 268, 269, 63 L.Ed. 577 (1919). Second, the petitioners argue that Congress had no rational basis for finding that the activity of distributing gas for outdoor lighting purposes affects interstate commerce. Finally, they assert that the means chosen by Congress under the Fuel Use Act is not reasonably adapted to the ends set out in the first section of the Act, namely, to conserve natural gas and to protect industries whose only viable source of power is natural gas.

We agree with the petitioners' framing of the relevant issues in a constitutional attack upon federal legislation based upon the Commerce Clause. The constitutionally prescribed inquiry in a Commerce Clause challenge involving traditionally local activities necessitates at the outset an examination of the effects of the regulated activity on interstate commerce. *United States v. Darby*, 312 U.S. 100, 121, 61 S.Ct. 451, 460, 85 L.Ed. 609 (1941). If such effects are wholly lacking, then the federal law in question must be held unconstitutional. Additionally the Court must assess the rationality of the congressional judgment in passing the Act. This involves an inquiry into: (1) whether there is a rational basis for Congress' determination that interstate commerce is indeed affected by the regulated activity; and, (2) whether the means chosen are reasonably adapted to achieve the intended legitimate goal. *Hodel v. Virginia Surface Min. & Rec. Ass'n*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981).

this time whether civil penalties for ongoing violations will be assessed whenever the Act is enforced. The speculative and contingent nature of petitioners' future economic injury makes this case of a kind that courts have in the past treated as unripe for adjudication. *See, e.g., United Public Workers of America v. Mitchell*, 330 U.S. 75, 89–90, 67 S.Ct. 556, 564–65, 91 L.Ed. 754 (1947) ("A hypothetical threat is not enough.") Nor does the tenuousness of the injury end there. The states, if they accept the Secretary's delegation, have full power to administer and enforce the Act. Presumably one state could decide to enforce the Act retroactively, whereas another could within its terms grant immunity to all past violators up to the day the state enforcement regulations are promulgated. No evidence has been submitted by any party suggesting how any of the states plan to initiate enforcement of the Act. That the petitioners come from different states makes it all the more unclear the precise nature and extent of the injury with which we are dealing under the Commerce Clause challenge.

Nevertheless, although the injury has not yet occurred but is merely one that the petitioners allege will occur in the future, this is not dispositive of the standing or ripeness issue. *See Pennsylvania v. West Virginia*, 262 U.S. 553, 555, 593, 43 S.Ct. 658, 659, 663–64, 67 L.Ed. 1117 (1923) ("[o]ne does not have to await the consummation of a threatened injury to obtain preventative relief.") Moreover, in the present

case, the Commerce Clause challenge is unlikely to change in substance or in clarity by virtue of an actual prosecution. Thus another of the values inherent in the ripeness doctrine, namely, the need for a concrete presentation of the issues, would not be served by awaiting enforcement. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 153, 87 S.Ct. 1507, 1517, 18 L.Ed.2d 681 (1967). Finally, the petitioners in this case are now, and will in the future continue to be the most appropriate parties to raise the Commerce Clause objection. The Fuel Use Act, in its minimal prohibitive capacity, operates against local gas distribution companies. The petitioners are the entities against whom fines will be levied for noncompliance, if and when the Act is enforced.

In any event, this case is quite similar to two recent Supreme Court decisions in which the Court heard and determined the merits of a pre-enforcement, Commerce Clause challenge to other federal statutes and regulations. *See Hodel v. Virginia Surface Min. & Rec. Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *Hodel v. Indiana*, 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981). Neither of these opinions mentions any standing problems, and so we view them as adequate precedent for our decision to adjudicate the merits of the Commerce Clause dispute before us.

■ Nevertheless, we differ with the petitioners on the appropriate result that follows from this inquiry. The mere fact that an admittedly local or intrastate activity such as the distribution of natural gas to local customers is affected by federal regulation does not automatically lead to a judgment that Congress has overstepped its powers under the Commerce Clause. As the Court said in *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), "The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." *Id.* at 118, 61 S.Ct. at 459.[8] Numerous other cases make it clear that the federal government may pass legislation to foster and protect the flow of interstate commerce even though the regulated activity may be purely local in character. Thus in *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the Court upheld federal legislation setting quotas on the production of wheat even though the regulations interfered with the wholly local pursuit of growing wheat for personal consumption. These cases require that the courts view the regulated activity in the context of the nationwide movement of commerce to determine whether there exists significant effects on interstate commerce.

■ In the present case, such effects are beyond dispute. It is of course true that the distribution of natural gas for outdoor lighting purposes is a local activity in the sense that its physical starting and ending points are geographically situated within the borders of a single state. But to so view the activity is to extract it from its place in interstate commerce and thus ignore its substantial ramifications for, and effects upon, such commerce. Local gas companies distribute natural gas to a variety of customers for a variety of uses. And a significant amount of gas is used to heat the office buildings of countless corporations, most of which are engaged in interstate, if not international, commerce. Decisions concerning the local distribution of natural gas thus directly affect the flow of interstate commerce. More importantly, as natural gas becomes more scarce, the reverberative adverse effects of decisions to supply non-necessary uses such as outdoor decorative lights will be felt with increasing alarm in the commercial community. Even if such effects seem minor in the context of one local gas company and its clientele, the combined effect of distribution decisions being made by companies all over the nation is substantial. *See Wickard v. Filburn*, 317 U.S. 111, 127–28, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942). To protect against these nationwide effects on interstate commerce, Congress may pass laws that impinge on intrastate activities. *See United States v. Darby, supra*, 312 U.S. at 114, 61 S.Ct. at 457.

Petitioners' citation to several relatively old United States Supreme Court cases does not persuade us to take a different view. *Federal Power Comm'n v. East Ohio Gas Co.*, 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950); *East Ohio Gas Co. v. Tax Comm'n of Ohio*, 283 U.S. 465, 51 S.Ct. 499, 75 L.Ed. 1171 (1931); *Public Utilities Comm'n of*

---

8. We recognize that the quoted language in *Darby* may present a problem of circular reasoning with respect to the question, "Which intrastate activities are an appropriate subject of the federal power to regulate interstate commerce?" Nevertheless, the *Darby* case at least establishes that the fact that the regulated conduct in this case is a wholly local activity does not necessarily lead to a finding that Congress has overstepped its powers under the Commerce Clause. *United States v. Rock Royal Co-operative, Inc.*, 307 U.S. 533, 569, 59 S.Ct. 993, 1011, 83 L.Ed. 1446 (1939) ("Activities conducted within State lines do not by this fact alone escape the sweep of the Commerce Clause. Interstate commerce may be dependent upon them.")

*Rhode Island v. Attleboro Steam & Electric Co.,* 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549 (1927); *Missouri v. Kansas Natural Gas Co.,* 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027 (1924); *Public Utilities Comm'n For the State of Kansas v. Landon,* 249 U.S. 236, 39 S.Ct. 268, 63 L.Ed. 577 (1919). In these cases the Court characterized the activity of distributing natural gas as a purely local affair. They are nevertheless distinguishable from the present case in two significant respects. First and most importantly, the cases involved only state regulation of local gas distribution companies and thus the question of the extent of federal commerce power was not before the Court.[9] The issue presented in each case was whether the activity of distributing natural gas should be characterized as interstate commerce for purposes of determining whether the disputed state regulations improperly interfered with the flow of such commerce.[10] In that context, the Court declared the regulations permissible, holding that the interstate aspect of natural gas commerce terminated at the local mains. *E.g., Public Utilities Comm'n v. Landon,* 249 U.S. 236, 245, 39 S.Ct. 268, 269, 63 L.Ed. 577 (1919). The cases thus serve merely to delineate the extent of the flow of interstate commerce, and do not purport to define the extent of Congress' power to regulate activities affecting such commerce.[11] And we have already established that Congress' power to regulate commerce is not restricted to the regulation of only interstate activities, but extends to the regulation of local activities

affecting interstate commerce. *See* p. 1364 *supra.* The fact that the Supreme Court has characterized gas distribution as a local activity is thus in no way determinative of the Commerce Clause issue before us today.

Secondly, the Court's characterization of gas distribution as a purely local activity must be squared with more recent cases firmly establishing that the activity involved in this case is one in interstate commerce. In *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), the Court upheld the power of Congress to prohibit racial discrimination in any restaurant serving food that has been shipped in interstate commerce. *Id.* at 304, 85 S.Ct. at 383–384. No party to the present case denies that much of the natural gas supplied to local customers in one state has been piped from another state. This fact by itself is sufficient after *Katzenbach* to justify our understanding of the activity of gas distribution as one in interstate commerce.

With these points made we are left with the determination whether Congress acted rationally in adopting the Fuel Use Act. In short we believe Congress did act rationally in seeking to regulate local gas distribution by means of this Act.

First, it is clear that Congress had a rational basis for determining that distributing gas for use in outdoor lights affects interstate commerce. Congress was aware that a constant supply of natural gas is critical to the continued operation of many commercial industries in our country. Con-

---

9. In point of fact one of the cases cited dealt with federal regulations. In *Federal Power Comm'n v. East Ohio Gas Co.,* 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950), the Court upheld the extension of federal regulatory power over a gas company that transported natural gas through interstate pipelines for local distribution. That case can only support the principles set out in this opinion.

10. Since the case of *Cooley v. Board of Wardens of the Port of Philadelphia,* 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851), the Supreme Court has recognized a limitation on State authority to regulate activities in interstate commerce. These limitations arise by negative im-

plication from the Constitution's express grant of power to the federal government to regulate interstate commerce, as well as from considerations of federalism that emanate from the system of government set up in the Constitution. *See* L. Tribe, American Constitutional Law 320–326 (1978).

11. *See Katzenbach v. McClung,* 379 U.S. 294, 302, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964) (line of cases holding that interstate commerce ends when goods come to rest in state of destination applies to state regulation but not to federal regulation).

gressman Dingell, who introduced Section 402 of the Act, cited a study in support of the statute demonstrating that seemingly minor steps toward conserving natural gas could be of great protective benefit to industries that rely on gas for ongoing operations. Transcript, Joint Conference on Energy, 95th Cong., 1st Sess. 2009–2011, 2033–2036 (1977). In that study the Commonwealth of Virginia found that the potential gas savings resulting from a prohibition on natural gas use in outdoor lighting in the state of Virginia was sufficient to sustain for several weeks the massive local operations of the Allied Chemical Corporation. In addition, Congressman Dingell cited statistics established by the Federal Energy Agency estimating that the potential savings of natural gas due to a nationwide discontinuance of service to all outdoor lights in this country would be between 36 and 73 billion cubic feet of gas per year. Transcript, Joint Conference on Energy at 2034.[12]

Petitioners argue that the relatively small amount of gas savings that would result from the prohibitions in Section 402, namely, two-tenths of one percent of all natural gas consumed annually, undercuts any rational basis Congress may have had in determining that distribution for such consumption affects interstate commerce. We may quickly dismiss this argument in the light of the recent *Hodel* cases, wherein the Supreme Court explicitly declared that the volume of commerce affected is not the touchstone of the rationality test under the Commerce Clause. *See Hodel v. Indiana*, 452 U.S. 314, 101 S.Ct. 2376, 2383, 69 L.Ed.2d 40 (1981).

Second, we find that the prohibitions contained in Section 402 are reasonably adapted to the legitimate goal of protecting interstate commerce from the adverse effects of using natural gas for outdoor lighting purposes. The gas savings produced by the Act's prohibitions benefit commercial industries by helping to protect them from the threat of gas shortages in critical periods of the year. The fact that these savings represent only a small percentage of total gas consumption does not undercut our judgment of the rationality of the means employed in this case. In the first place, as just indicated the volume of commerce involved is not the appropriate focus in determining the rationality of the congressional action.[13] More importantly, the relatively small gas savings resulting from the Fuel Use Act must be considered as an integral part of a much broader federal regulatory program aimed at shifting our nation's energy consumption toward fuels that are more plentiful and accessible than natural gas. When Section 402 is viewed both in conjunction with the other provisions of the Fuel Use Act regulating fuel use by local power companies, *see* p. 1362 *supra,* and with the four other bills enacted collectively with the Fuel Use Act to deal with the national energy situation, *see* note 1, *supra,* we find that Section 402 is a rational part of a larger regulatory scheme the whole of which is reasonably adapted to the legiti-

---

**12.** Congressman Dingell noted that the value of such gas was, at that time, between 10 and 15 billion dollars. Transcript, Joint Conference on Energy at 2036.

**13.** Admittedly, the Court in *Hodel* rejected the "volume of commerce" standard only in its discussion of the first aspect of the rationality test, namely, whether Congress had any rational basis for finding that the regulated activity affected interstate commerce. *Hodel v. Indiana*, 452 U.S. 314, 101 S.Ct. 2376, 2383, 69 L.Ed.2d 40 (1981). We feel it logically appro-

priate, however, to likewise reject this standard under the second, "reasonably related" prong of the rationality test. The Court in *Hodel* found the congressional act constitutional. If the volume of commerce involved in that case had been problematic under the "reasonably adapted" prong of the test, then we suggest that the Court would have held the Act unconstitutional. In the alternative, the Court's holding can be viewed as having implicitly determined that the volume was sufficient to satisfy the "reasonably adapted" test.

mate ends set out in the first provisions of the Act.[14]

### III.

 The petitioners also argue that Section 402 and the regulations violate the Tenth Amendment.[15] They rely principally on the case of *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), where the Supreme Court acknowledged that "there are limits upon the power of Congress to override state sovereignty, even when exercising its otherwise plenary powers to tax or to regulate commerce which are conferred by Art. I of the Constitution." *Id.* at 842, 96 S.Ct. at 2470. We cannot agree with petitioners for the reasons that follow.[16]

The most recent Supreme Court discussion of these Tenth Amendment limitations can be found in the companion *Hodel* cases previously mentioned. In *Hodel v. Virginia Surface Min. & Rec. Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), the Court decided that the success of a claim that the exercise of congressional commerce power violates the holding in the *Usery* case depends on the satisfaction of each of three requirements. "First, there must be a

showing that the challenged statute regulates the 'States as States.' Second, the federal regulation must address matters that are indisputably 'attributes of state sovereignty.' And third, it must be apparent that the States' compliance with the federal law would directly impair their ability 'to structure integral operations in areas of traditional functions.'" *Id.* at 2366. (Citations to *Usery* omitted.) In both *Hodel* cases, the Court held that the act in question [the Surface Mining Control & Reclamation Act] did not satisfy the first requirement of regulating the states as states and thus did not violate the Tenth Amendment. *Id.; Hodel v. Indiana*, 452 U.S. 314, 101 S.Ct. 2376, 2386, 69 L.Ed.2d 40 (1981). For similar reasons, we also so hold.

In the first place, the Fuel Use Act regulations promulgated by the Secretary of Energy are directed not to the "States as States," but rather to the wholly private natural gas distribution industry. They prohibit actions taken by private gas companies. That they pre-empt state regulations contrary to or inconsistent with their contents does not implicate the Tenth Amendment. As the Court in *Usery* ruled:

> Congressional power over areas of private endeavour, even when its exercise

14. *Hodel v. Indiana*, 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981) ("It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test.") *Id.* at 2385 n. 17. *See Maryland v. Wirtz*, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968).

15. The Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S.Const. amend. 10.

16. Just as in the Commerce Clause issue we must initially express our uncertainty about whether the petitioners have standing to raise the Tenth Amendment question. None of the petitioners are states or government officials of any kind. In *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Supreme Court intimated under its nexus requirement that a private party could not have standing to assert the interests of the states as protected by the Tenth Amendment. Nevertheless, we

grant standing in this case for two reasons. First, during the New Deal era the Supreme Court granted such standing by implication in considering the merits of the Tenth Amendment claims brought by private parties. *See Helvering v. Davis*, 301 U.S. 619, 637, 640, 57 S.Ct. 904, 907, 908, 81 L.Ed. 1307 (1937); *Steward Machine Co. v. Davis*, 301 U.S. 548, 573, 585, 57 S.Ct. 883, 884, 890, 81 L.Ed. 1279 (1937). Second, the Court in *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), expressly limited the nexus requirement contained in *Flast* to taxpayer suits. Since this is not a taxpayer suit, under *Duke Power* the petitioners may make constitutional objections based on any of its provisions so long as they show the requisite injury in fact and its causal relation to the action in question. Because we have already concluded that injury in fact exists or is likely to occur in this case, *see* note 7 *supra*, we find it necessary to reach the merits of the Tenth Amendment issue.

may pre-empt express state-law determinations contrary to the result that has commended itself to the collective wisdom of Congress, has been held to be limited only by the requirement that "the means chosen by [Congress] must be reasonably adapted to the ends permitted by the Constitution."

*Id.* 426 U.S. at 840, 96 S.Ct. at 2469 (quoting *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964)). *See Hodel v. Virginia Surface Min. & Rec. Ass'n, supra* 101 S.Ct. at 2368 (1981) (Congress does not violate the Tenth Amendment simply because it acts in a way that displaces states' exercise of police powers).

It is true that the Secretary of Energy in accordance with his express statutory authorization has delegated his administrative and enforcement powers to the appropriate state regulatory authority. Petitioners interpret this delegation as a mandatory scheme whereby the states are forced to administer and enforce the regulatory prohibitions. As such they assert that the Tenth Amendment is implicated because it coercively appropriates state regulatory power to accomplish a federal regulatory objective. *See District of Columbia v. Train,* 521 F.2d 971, 990 (D.C.Cir.1975).[17]

Whatever the force of their contention we do not consider it necessary to reach it in substance because we disagree with the petitioners' reading of the delegation provisions. Although the Secretary has delegated his powers under the Act, the states remain free to reject the delegation and thereby refuse to enforce the regulations.

Should any state so refuse to implement the Act, under the terms of the Act and the regulations the Secretary can do nothing more than rescind the delegation. *See* 10 C.F.R. § 516.32 (1981). There is thus no element of coercion involved in the delegation. Just as in *Hodel,* the Act merely "establishes a program of cooperative federalism that allows the states within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Virginia Surface Min. & Rec. Ass'n, supra* 101 S.Ct. at 2366 (1981). Such a regulatory scheme thus protects the states' interest in remaining free to "structure integral operations in areas of traditional governmental functions," *National League of Cities v. Usery, supra* 426 U.S. at 852, 96 S.Ct. at 2474, without running afoul of Tenth Amendment limitations.

### IV.

The petitioners also urge this Court to hold the Fuel Use Act unconstitutionally vague under the Due Process Clause of the Fifth Amendment.[18] Essentially the petitioners complain of substantial uncertainty as to how best to comply with the prohibitions in Section 402. We do not reach the merits of the petitioners' due process claim because the issue is not ripe for adjudication at this time.

As we have indicated previously, the Secretary of Energy has delegated to the states his entire authority under the Fuel Use Act. *See* 10 C.F.R. § 516.30 (1981). Under the terms of this delegation, the

---

**17.** In *Hodel* the Court similarly indicated that Tenth Amendment problems might exist where a federal regulatory program requires the states to adopt implementing regulations. *Hodel v. Virginia Min. & Rec. Ass'n,* 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981). In that case the Court held that the federal statute gave the states a choice as to whether they or the federal government would administer and enforce the program and thus did not violate the Tenth Amendment.

**18.** That provision states in pertinent part: "No person shall ... be deprived of ... property, without due process of law...." U.S.Const. amend. V. The courts have interpreted this clause to require that statutes be reasonably clear so that persons of common intelligence do not have to guess at their meaning and differ as to their application. *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

states have the authority to promulgate regulations, establish exemption procedures and criteria and issue exemption orders, and establish enforcement mechanisms and assess civil penalties. In large part then, the regulations grant to those states that accept the delegation broad powers to promulgate their own set of regulations and exemption criteria. Moreover the delegation provisions give the states substantial flexibility in promulgating these regulations. That the states possess such regulatory freedom under the Act has been an explicit intention of Congress and the Department of Energy from the beginning. As the Department explained in their introductory comment to the proposed rules published in the Federal Register, "We propose to exercise this option [to delegate to the states], noting that the congressional conferees, in their Explanatory Statement for the Act, explicitly encouraged DOE to do so. Enforcement of the statutory provisions of the Act constitutes a regulatory activity most appropriately conducted at the State level ... Delegating authority to the appropriate state regulatory authorities, with minimum Federal guidance, will allow sensitivity to local conditions."

 Congress and the Department of Energy clearly intended that the states be the primary regulators under the Fuel Use Act. Yet the petitioners in the present case challenge on due process grounds only the federal statute and implementing regulations, making no claim whatsoever regarding the vagueness of a particular state's regulatory program. At this time it is not clear which states have promulgated regulations under the Act, nor even which have accepted the Secretary's delegation.[19] Until the petitioners can show that there presently exists a set of regulations so vague in their terms that reasonably intelligent persons would differ as to their meaning and application, then they have failed to establish a vagueness claim under the Fifth

Amendment. *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

The petitioners claim that they are uncertain as to how they must comply with the prohibitions in Section 402 regarding distribution of gas to residential customers. In our opinion the claim is not ripe. There is no allegation that a particular state has indeed enacted a set of vague and uncertain rules. Neither is there any claim that a state has or will pass regulations holding a gas distribution company liable retroactively for violations occurring prior to the promulgation of the state rule. Presumably, a state could, without overstepping its powers to establish exemption criteria under the federal regulation concerning delegation, exempt all pre-promulgation violators, thus leaving parties such as the petitioners in this case with no injury in fact. The contingent nature of the petitioners' due process claim is of a sort that courts have in the past avoided until another day. *See United Public Workers of America v. Mitchell*, 330 U.S. 75, 85–90, 67 S.Ct. 556, 561–65, 91 L.Ed. 754 (1947). So shall we today.

DISMISSED.

---

**19.** Apparently it is the case that the State of Texas, or rather the Texas Railroad Commission, has in fact sent a letter to the Secretary of Energy explicitly rejecting the delegation. The Secretary has not yet, however, rescinded the delegation.